IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

EMILIO ROMERO,                          :       JURY TRIAL DEMANDED
       Plaintiff                      :
                                :       NO:  3:19-CV-01038-JFS
                                :
               vs.                     :
                                :
TOBYHANNA TOWNSHIP, PA;                 :
MOUNT POCONO BOROUGH;                   :
COOLBAUGH TOWNSHIP;                     :
BARRETT TOWNSHIP;                       :
CHIEF OF POLICE CHRIS WAGNER;           :
DETECTIVE LUCAS BRAY;                   :
DETECTIVE MARK WEBBE,  &                :
ASSISTANT DISTRICT ATTORNEY;            :
MICHAEL RACKACZEWSKI;

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF EMILIO ROMERO'S RESPONSE TO PLAINTIFF'SMOTION FOR SUMMARY JUDGMENT

The Plaintiff, Emilio Romero, avers, pursuant to LR 56.1, that the

following facts are not in dispute and may be considered by the Court in

support of his opposition to Plaintiff's motion for summary judgment:        :

### Facts underlying Criminal Prosecution of Plaintiff

  1. The Plaintiff, Emilio Romero, resided in Tobyhanna, Pennsylvania with his wife of

thirteen years, Erika Jones, and their daughter, their daughter, nine year old BR.

-1-

**(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 105, lines 1-25, p. 106, line 1)**.

-1-

**2.** Plaintiff supported his family, since 2013, as an  union affiliated iron worker in New York City.  **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 106, lines 2-9)**.

**3.**  Plaintiff was a supervisor in charge of the rigging of  1,500 pound glass panels for the new Tower 3 World Trade Center.  **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2019, p. 106, lines 12-17).**

**4.**  As BR got older, Plaintiff and Ms. Jones  decided to sleep in separate rooms, with BR sleeping in a bedroom with Ms. Jones, while Plaintiff slept in the living room.  **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 107, lines 3-14).**

**5.**  Sometime in May, 2017, the Plaintiff, Emilio Romero, became concerned about the well being of his eight year old daughter, BR, because his wife, the mother of BR, was constantly getting high and inquiring whether Plaintiff could purchase her marijuana, refused to enroll BR in school, was always semi-nude in the home, as she never wore panties, unless she was menstruating, and had a bizarre spiritual awakening in which she would literally dance nude around a pole in her bedroom for Jesus. **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Jury Trial, 12/13/2018, p. 108, lines18-25,**

-2-

**p. 109, lines 1-13, p. 110, lines 2-7, p. 116, lines 24-25, p. 117, lines 1-8).**

**6.**    Eventually Plaintiff  became suspicious that his wife was displaying herself online, because while she never wore underwear around him, she began asking him to purchase her sexy underwear.  **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Jury Trial, 12/13/2019, p.  111, lines 11-25, p. 112, lines 1-25, p. 113, lines 1-11**).

7  To confirm his suspicions that Ms. Jones' was producing amateur online video porn, Plaintiff installed cameras in the home.  **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Jury Trial, 12/13/2018, p. 111, lines 5-9**).

8.  Nevertheless, Plaintiff decided to attend Church in an effort to show hia wife that he wanted to repair their marriage by sharing her religious experience, but she rejected Plaintiff's religious overtures because in her view he was insincere.  **(N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 119, lines 22 -25, p. 120, lines 1-25, p. 121, lines 1-2**).

9.  The state of Plaintiff's marriage became so frayed that  Ms. Jones  began sending him threatening texts which warned that even though they were married she could have him arrested for Rape , which included articles about "spousal rape."  **(Exhibit C, N.T. Cross Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 2018, p. 152, lines 8-25**).

10.    Although Plaintiff's cellphone was recovered by Mount Pocono Police, placed on a property receipt by Defendant, Detective Lucas Bray, and ultimately subject by a forensic examination by Defendant, Detective Brian Webbe, these texts were not provided as part of discovery, as Detective Bray noted that while the phone contained a video of the alleged sexual assault, there was no mention of Ericka Jones' threatening emails. ( **Exhibit G, Police Report Compiled by Defendant, Detective Lucas Bray, page 15)**

11.    Concerned about Ms. Jones threats, Plaintiff decided that he would videotape future sexual encounters between them on his cellphone., including the incident in the ***case sub judice*** **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero,  Criminal Jury Trial, 12/13/2018, p. 140, line 25, p. 141, lines 1-4)**

12.    Eventually, because Plaintiff was concerned that hia wife was beating their daughter, failed to enroll her in school and was smoking marijuana,he reported Ms. Jones conduct to Monroe County Children and Youth Services.  **(Exhibit D, N.T. Cross Examination of the Plaintiff, Emilio Romero,Criminal Jury Trial, 12/13/2018, p. 150, lines 22-25, p. 151, p. 1-11)**.

**13.**    While at work, Mr. Romero, saw through his telephone home security system that a CYS caseworker had arrived to the home.  **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 113, lines 16-22).**

14. Plaintiff spoke to the caseworker through his phone and told her that no one was home then asked her to leave her contact information, which the caseworker provided by sticking her business card in between Plaintiff's doorway.   **(Exhibit D, N.T. Direct Examination of the Appellant, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 113, lines 24-25, p. 114, lines 1-13)**.

15.    Within minutes of the CYS worker's departure, Ms. Jones, who was home upstairs, went downstairs and discovered the CYS worker's card in the doorway then asked Plaintiff why a CYS worker came to their home, to which Plaintiff replied that he didn't know but would call and find out. **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 114, lines 14-18)**.

16.   Plaintiff called CYS on a three way with his wife on the line.   **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 114, lines 17-23)**.

17.The CYS worker reported that there had been multiple allegations, including that Erika Jones was beating BR, did not have BR enrolled in school and BR had not been vaccinated, but assured them that those grievances were not actionable under Pennsylvania law, where parents have the right to discipline their children, children are not required to be enrolled in school until 8 and Plaintiff could always schedule vaccinations through his health insurance. **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 114, lines 24-25, p. 115, lines 1-15)**.

18. However, the CYS worker did report that there were two allegations which her office was going to investigate further, that his wife smoked marijuana around BR, and that Plaintiff provided the Complainant with the marijuana. **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 114, lines 16-20).**

19. The CYS worker, Sandra James, arranged a home visit with Ms. Jones which was scheduled for June 22nd. **(Exhibit C, N.T. Cross Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 138, lines 24-25, p. 139, lines 1-6)**.

20. On the evening of June 21, 2017, after Appellant arrived home, the day before the scheduled June 22nd CYS visit, he received a text from Ms. Jones stating that she wanted sex that evening and for him to purchase KY jelly so that she could use her dildo. **(N.T. Direct Examination of Appellant, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 121, lines 22-25, p. 122, lines 1-12)**.

21. Appellant complied with the request. **(N.T. Direct Examination of the Appellant, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 122, lines 16-17)**.

22. Later that evening Erika Jones sent Plaintiff an angry text, complaining about her discovery of the pen camera, which she accused Plaintiff of employing to gather evidence for CYS that she was getting high around her daughter. **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 125, lines 24-25, p. 126, lines 1-5)**.

-6-

23.  Ms. Jones further texted to Plaintiff that God was going to remove him from the home. **(Exhibit C, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 126, lines 6-8)**.

24.    Nevertheless, later that evening Plaintiff and Complainant made up then had consensual sex.  **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Jury Trial, 12/13/2018, p. 128, lines 20-25, p. 129, lines 1-25, p. 130, lines 1-25, p. 131, lines 1-19)**.

25.   When the sexual encounter was over, Plaintiff and Complainant made a video in which they expressed their love for each other and kissed.  **(Exhibit D, N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/13/2018, p. 133, lines 16-25)**.

26.    The following morning, after Plaintiff went to work at his Ironworkers Union job in New York City and before the scheduled CYS visit, Ms. Jones called the Mount Pocono Regional Police,  **(N.T. Direct Examination of the Plaintiff, Emilio Romero, Criminal Jury Trial, 12/12/2018, p. 106, lines 7-19)**.

27.    During the early evening of June 21, 2017, at approximately, 8:30 pm, the Ms. Jones, was home with the Plaintiff  and their seven year old daughter BR, when Plaintiff entered her bedroom and attempted to give Brianna a pen.  **(Exhibit C, N.T. Direct Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 90, line 25, p. 91, lines 1-4)**.

28. The Complainant  examined the pen and discovered a camera on

it and asked Plaintiff what he was doing.  **(Exhibit C, N.T. Direct Examination of the**

**Erika Jones,Criminal  Jury Trial, 12/12/2018, p. 91, lines 6-7)**.

29. Plaintiff responded by snatching the pen, but Ms. Jones wrested control of the pen and

put it under her mattress for evidence that she was being filmed.  **(Exhibit C, N.T. Direct**

**Examination of the Complainant, Erika Jones, Criminal Jury Trial, 12/12/2018, p. 91,**

**lines 15-18)**.

30.    Later that evening, standing in the hallway when the Complainant came out of the

bathroom.  **(Exhibit C, N.T. Direct Examination of the  Erika Jones, Criminal Jury**

**Trial, 12/12/2018, p. 93, lines 1-5).**  Ms. Jones said something to Plaintiff, at which time

he  immediately pulled out a gun and pointed it at Ms. Jones and told her to shut the fuck up

and get in the room. **(Exhibit C, N.T. Direct Examination of Erika Jones, Criminal Jury**

**Trial, 12/12/2018, p. 93, lines 12-16)**.

 31.    Ms. Jones  began crying and screaming "I knew you were going to kill me," which

caught the attention of BR who came out of her room and asked "what's wrong,"  **(Exhibit**

**C, N.T. Direct Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p.**

**93, lines 22-25, p. 94, lines 1-6).**

31.  Both Plaintiff and Ms. Jones reassured BR that everything was fine and told her to go

back to her room.  **(Exhibit C, N.T. Direct Examination of  Erika Jones, Criminal Jury**

**Trial, 12/12/2018, p.  94, lines 6-9)**.

-8-

32. BR went back to her room, as the Plaintiff put the firearm, which was big and black, to the Ms. Jones' head and forced her back into the bedroom. **(Exhibit C, N.T. Direct Examination of the Erika Jones, Criminal Jury Trial, 12/12/2018, p. 94, lines 13-24)**.

33. Plaintiff put a pillow on the back of Ms. Jones' head then put a gun on the top of the pillow and asked her if she had any final words, to which she replied "King Jesus I love you." **(Exhibit C, N.T. Direct Examination of the Erika Jones, 12/12/2018, p. 95, lines 2-6)**.

34 Plaintiff pulled the trigger, but the gun merely clicked and didn't fire. **(Exhibit C, N.T. Direct Examination of Erika Jones, Jury Trial, 12/12/2018, p. 95, lines 16-21)**. Plaintiff told the Ms. Jones that she "was lucky that time." **(Exhibit C, N.T. Direct Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 95, lines 21-23)**.

35. Plaintiff then picked up a copy of the Bible and said you are my wife and you need to be obedient, and that if she didn't return to her old self he was going to kill her. **(Exhibit C, N.T. Direct Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 96, lines 2-8)**.

36. At some point, BR sent Ms. Jones a text, in which she wrote that she heard Complainant crying because of Plaintiff. **(Exhibit C, N.T. Direct Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 96, lines 23-25, p. 97, lines 1-10)**.

37. Ms. Jones then left the room to go check on BR and reassure her that everything was alright. **(Exhibit C, N.T. Direct Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 97, lines 14-21)**.

38.     When Erika Jones returned to the bedroom, Plaintiff reiterated that she needed to be obedient to him then ordered her to get her dildo. **(Exhibit C, N.T. Direct Examination of the Erika Jones,Criminal Jury Trial, 12/12/2018, p. 100, lines 23-25, p. 101, line 1)**.

39. 39. Erika Jones got the dildo for Plaintiff, who forced her to lay down flat on the bed at gunpoint. **(Exhibit C, N.T. Direct Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 101, lines 11-21)**.

40. Plaintiff then applied KY jelly to the dildo and rammed it inside of Ms. Jones vagina, without her consent. **(Exhibit C, N.T. Direct Examination of the Erika Jones, Criminal Jury Trial, 12/12/2018, p. 102, lines 1-4)**.

41. After penetrating Ms.Jones with the dildo,Plaintiff raped Complainant, by inserting his penis into her vagina from behind, as she continued to bend over, without her permission. **(Exhibit C, N.T. Direct Examination of Erika Jones,Criminal Jury Trial, 12/12/2018, p. 103, lines 1-25)**.

42. After raping Ms. Jones at gunpoint for approximately 25 minutes, Plaintiff ejaculated in Complainant's vagina then let her go. **(Exhibit C, N.T. Direct Examination of the Complainant, Criminal Jury Trial, 12/12/2018, p. 104, lines 12-21)**.

43.   Ms. Jones' version of the incident at trial differed greatly from the statement that she gave Detective Lucas Bray, shortly after the alleged assault., which reads as follows:

> At around 8:30 p.m., I found a camera pen in my room and confronted Emilio Romero about putting the camera in my room and a slight argument happened.
>
> I came out of my room to the bathroom and Emilio Romero was standing in the hallway and I asked him whey he was standing in the hallway and he pulled out a big black gun and pointed it at me and demanded me to go in my bedroom.
>
> He put the gun on the back of my head and made me go in my bedroom.  I went kin the bedroom and he kept telling me he was going to kill me.
>
> After repeated threats he put the gun to the back of my head though a pillow and pulled the trigger.  Nothing happened and he told me I was lucky that time.
>
> He demanded me to remove my clothes while pointing the gun at me.  I was begging him no but he kept threatening me. Then he came and busted the door down acting like be was going to hit me with the gun.

-11-

*Then he proceeded to take my clothes off, made me get on*

*my bed and proceeded to rape me while I cried.  He started*

*recording it on his phone, then he made me turn around and he*

*he started to rape me from behind threatening to go in my anus*

*while he recorded it on his phone.*

*Then he ejaculated in me and let me go.  I wiped his*

*cum off of my panties and went in the bathroom and*

*cleaned up."*

**(Exhibit C, Direct Examination of Detective Lucas Bray Reciting the Erika Jones'**
**Post Incident Statement to Police,Criminal Jury Trial, 12/12/2018, p. 86, lines 11-25, p.**
**87, lines 1-17)**

44 Where unlike her trial testimony, she did not say that Plaintiff sexually assaulted her

with a dildo and did not include any mention of Plaintiff reading the bible.  **(Exhibit C, N.T.**

**Cross Examination of Erika Jones,Criminal  Jury Trial, 12/12/2018, p. 144, lines 21)**.

45 Also unlike her trial testimony, where she did not mention Plaintiff breaking her

bedroom door down and testified that Plaintiff stayed in her bedroom during the entire

incident,  the Complainant told Detective Bray that Plaintiff busted her bedroom door

went and checked on BR.  **(Exhibit C, N.T. Cross Examination of Erika Jones, Criminal**

**Jury Trial, 12/12/2018, p. 144,  22-25, p. 145, lines 1-7)**.

46.     Contrary to her statement to Detective Bray,  was established on cross examination of Ms. Jones  that her bedroom door was not broken on the night of June 21st, but weeks earlier during a videotaped incident, which was presented to the jury, in which the door was accidentally damaged by Plaintiff when he attempted to break into her bedroom because he thought that she was talking to herself, or in the words of the Ms. Jones, to God.  At no time during the video depicting her bedroom door being damaged did Plaintiff threaten to kill her.**(Exhibit C, N.T. Cross Examination of the Erika Jones, Criminal Jury Trial, 12/12/2018, p. 147, lines 19-25, p. 148, lines 1-23, p. 149, lines 24-25, p. 1).**

47. Erika Jones testified to the jury that during the door busting incident  Plaintiff held her against the wall at knifepoint, but this also was not depicted in the video.  **(Exhibit C, N.T.  Cross Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 150, lines 1-20)**.

48.     It was further established during review of the sexual encounter, which was videotaped, that Plaintiff did not possess a firearm at anytime during their sexual encounter, did not threaten to kill her, and that the sexual encounter though clearly "rough sex," concluded on an amicable note with the two kissing.  **(Exhibit C, N.T. Cross Examination of Erika Jone, Criminal Jury Trial, 12/12/2018, p. 17, lines 12-25, p. 177, lines 1-25).**

**49.**     Also contrary to the Erika Jones' testimony, the video did not depict Plaintiff penetrating Ms. Jones' vagina with a dildo.  **(Exhibit C, N.T. Cross Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 178, lines 13-19)**.

-13-

50.     At no time during the video of the incident did Erika Jones tell Plaintiff to stop. **(Exhibit C, N.T. Cross Examination of the Erika Jones, Criminal Jury Trial, 12/12/2018, p. 175, lines 10-19)**.

51.    The following morning Erika Jones  reported the incident to the Pocono Mountain Regional Police, after the Plaintiff  went to work.  **(Exhibit C, N.T. Direct Examination of the Erika Jones, Criminal Jury Trial, 12/12/2018, p. 107, lines 12-15)**.

52.     Following a preliminary investigation conducted by Corporal Steven Mertz and Officer Scott Dunlap, who took initial statements from Erika Jones Detective/Corporal Lucas Bray of the Pocono Mountain Regional Police prepared a search warrant for Plaintiff's home, which was approved by the District Attorney's and, subsequently, issued by the magistrate.  **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 79, lines 1-6, 80, lines 5-8, p. 81, lines 10-14)**.  The search warrant listed firearms and ammunition, Plaintiff's iPhone 6, a camera pen, the home video surveillance system, digital media devices as the principal items of interest to be searched for.  **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 83, lines 14-25)**.

53.    Detective Bray, with the aid of Detective Boeheim, Detective Venneman, and Officer Vaccaro exexuted the search warrant, which resulted in the discovery of a black BB handgun that was locked in a small safe in Plaintiff's room, several pieces of covert recording devices, the camera pen, Ms. Jones' panties, a pink dildo, as well as the

her cellphone. **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 82, lines, 5-9, p. 87, lines 18-25, p. 88, lines1-10, p. 99, lines 17-25, p. 100, lines 1-25, p. 103, lines 11-25, p. 105, lines 19-25, p . 112, lines 7-20, p. 114, lines 4-6, p. 125, lines 6-12, p. 126, lines 4-5)**. After execution of the search warrant, Detective Bray prepared an affidavit and arrest warrant for Plaintiff's cellphone. **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 82, lines 9-11).  (Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 90, lines 3-5)**.

54.  Plaintiff told Detective Bray that he would come to the station that day but didn't. **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 90, lines 5-6)**.  The following day, June 24, 2017, Plaintiff was arrested inside his home after the Complainant call 9-1-1.  **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 90, lines 8-12)**.

55.     Immediately following Plaintiff's arrest, Detective Bray conducted a custodial interrogation of Plaintiff, which was audio and video recorded.  **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 91, lines 15-22)**.

56.  Prior to the custodial interrogation, Plaintiff asked Detective Bray if he could contact his attorney Brian Gaglione, Esquire, who he had retained for the case, but the interview was not stopped to permit Plaintiff to speak to Mr. Gaglione.  **(Exhibit C, N.T. Cross**

-15-

**Examination of Detective Lucas Bray, Criminal Jury Trial, 12/13/2018, p. 62, lines 10-25, p. 63, lines 1-23)**.

57.     Incident to Plaintiff's arrest police recovered his iPhone 6 and subsequently conducted a forensic analysis for text messages, videos and other recordings, much of which had been deleted but was recovered through forensic analysis. **(Exhibit C,  N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 1-2, lines 1-19, p. 131, lines 6-8)**.

58.     During the interview, Plaintiff denied actually having sexual intercourse with Ms. Jones, but stated that she  used a dildo on herself while he masturbated.  **(N.T. Direct Examination of Detective Lucas Bray, Jury Trial, 12/12/2018, p. 113, lines 6-10)**.  Plaintiff told Detective Bray that his wife wanted him to ejaculate on her panties. **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 114, lines 1-2)**.  Plaintiff also denied recording the sexual assault.  **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 135, lines 14-16)**.

59.   Detective Bray admitted that criminal suspects typically do not volunteer unflattering information that casts them in a bad light after just being arrested.  **(Exhibit D, N.T. Cross Examination of Detective Lucas Bray, Jury Trial, 12/13/2018, p. 64, line 25, p. 65, lines 1-22)**.

60.     Detective Bray recovered the video of the sexual encounter in question through a forensic analysis of Plaintiff's cellphone, conducted by Detective Brian Webbe.  **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 135, lines 20-25, p. 136, lines 1-3)**.

61.     Detective Webbe received Plaintiff's cellphone at 6:50 am on June 26, 2017, and possessed his  cellphone for investigation several days thereafter, including  June 27, 2018. **(Exhibit C, N.T. Cross Examination of Detective Brian Webbe, Criminal Jury Trial, 12/12/2018, p. 66, lines 18-25, p. 67, lines 1-7, p. 69, lines 23-25)**.  Detective Webbe conducted his forensic analysis of Plaintiff's phone on June 26, 2017, 2017 from 8:23 am to 10:03 am.  **(Exhibit C, Cross Examination of Detective Brian Webbe, Criminal Jury Trial, 12/12/2018, p. 35, lines 17-25)**.

62.   Detective Webbe had Plaintiff's cellphone until June 27,  **a**t 7:03 am on June 27th an e-mail was sent from Plaintiff's  phone to Detective Lucas Bray's cellphone, which was one of fourteen e-mails sent to Detective Bray's cellphone. **(Exhibit C, N.T. Cross Examination of Detective Brian Webbe, Criminal Jury Trial, 12/12/2018, p. 66, lines p. 70, lines 1-11)**.

63. When asked about the e-mails, Detective Webbe testified that he did not recognize them, eventhough he testified that he possessed Plaintiff's cellphone on June 27th and did not return Plaintiff' cellphone to Detective Bray until several days later. **(Exhibit C, N.T. Cross Examination of Detective Brian Webbe, Jury Trial, 12/12/2018, p. 67, lines 8-16)**.

-17-

64.   Immediately after being questioned about the 14 emails on Plaintiff's cellphone, the Court called a recess.  **(Exhibit C, Jury Trial, 12/12/2018, p. 68, lines 15-22).**  During the recess Plaintiff overheard Detective Webbe speaking to Defendants, Detective Bray and ADA Michael Rackaczewski, who both instructed Detective Webbe, to perjure himself and testify that he returned the phone to Detective Webbe.  **(Exhibit A, Deposition of the Plaintiff, Emilio Romero, 9/03/2020, p. 41, lines 23-24, p. 42, lines 1-21, p. 43, lines 13-24, p. 44, lines 1-15).**

65.   When the trial resumed, Detective Webbe followed the instructions of Detective Webbe and ADA Rackaczewski and backpedaled further, not only reiterating that he did not recognize the e-mails, but then then ttestifying   that he may have returned the cellphone to Detective Bray on the 27th and added that although he had the date and time recorded as to when he received the cellphone, he did not have the date and time recorded as to when he returned the cellphone.  **(Exhibit C, N.T. Cross Examination of 70, lines 21-25, p. 71, lines 1-3)**.

66.  Detective Webbe went on to entirely disavow his earlier testimony that he had Plaintiff's cellphone for several days, testifying that he was mistaken when he said that he had the cellphone for several days, although he typically possessed physical evidence for forensic examination for  a couple of days.  **(N.T. Cross Examination  of Detective Brian Webbe, Criminal Jury Trial, 12/12/2018,  p. 71, lines 15-18)**.

-18-

67.    When asked if during his forensic investigation if he uncovered several audio recordings of Plaintiff and the Complainant having consensual sex, Detective Webbe testified that he did not send the e-mails and was unaware of their content.  **(Exhibit C, N.T. Cross Examination of Detective Brian Webbe, Criminal Jury Trial, 12/12/2018, p. 71, lines 22-25, p. 72, lines 1-7)**.

68.    ADA Rackaczewski then interjected that it was Detective Lucas Bray who sent Plaintiff's e-mails to his own phone.  **(Exhibit C, Statement of ADA Michael Rackczczewski, Jury Trial, 12/12/2018, p. 74, lines 2-4)**.

**69.**  Detective Bray testified that he, in fact, received Plaintiff's iPhone back for the forensic examiner on June 27, 2018, after which he emailed the consensual sex recordings to his personal cellphone, rather than place the recordings in discovery to be turned over to defense by the Commonwealth. **(Exhibit D, N.T. Cross Examination of Detective Lucas Bray, Criminal Jury Trial, 12/13/2018, p. 72, line 25, p. 73, lines 1-9)**.

70.    Detective Bray admitted that there were a number of audio recordings from Appellant's iPhone depicting consensual sex between Plaintiff and the Complainant.  **(Exhibit D, N.T. Cross Examination of Detective Lucas Bray, Jury Trial, 12/13/2018, p. 71, lines 8-10)**.

71. Detective Bray also admitted that those audio recordings of consensual sex were not turned over to the Defense during the course of discovery, but only obtained after the undersigned counsel obtained permission from the court to go to the Pocono Mountain

Regional Police Barracks and listen to the recordings, which were then later provided just prior to trial. **(Exhibit D, N.T. Cross Examination of Detective Lucas Bray, Criminal Jury Trial, 12/13/2018, p. 71, lines 14-25)**.

72.     Detective Bray admitted that in the recordings of consensual sex, when Ms. Jones asked Plaintiff to stop or pull out he did. **(Exhibit D, N.T. Cross Examination of Detective Lucas Bray, Criminal Jury Trial, 12/13/2018, p. 74, lines 20-25, p. 75, lines 1-25, p. 76, lines 5-8)**. Conversely, Detective Bray admitted that during the videos of the alleged rape Ms. Jones never told the Plaintiff to stop. **(Exhibit D, N.T. Cross Examination of Detective Lucas Bray, Jury Trial, 12/13/2018, p. 76, lines 8-15)**.

73.     During one of the consensual sex encounters Ms. Jones was demanding that Plaintiff give her $3,500.00 from his vacation check. **(Exhibit D, N.T. Cross Examination of Detective Lucas Bray, Criminal Jury Trial, 12/13/2018, p. 77, lines 11-16)**. In the consensual sex videos Ms. Jones complained of pain but let him continue, just like the video depicting the alleged assault. **(Exhibit D, N.T. Cross Examination of Detective Lucas Bray, Criminal Jury Trial, 12/13/2018, p. 78, lines 1-11)**.

74.     Detective Bray further admitted that he gave Ms. Jones $7,000.00 recovered from the search of Plaintiff's  safe, even though Ms. Jones testified that the $7,000.00 belonged to Plaintiff and she never received the money. **(Exhibit C, N.T. Cross Examination of Detective Lucas Bray, Criminal Jury Trial, 12/13, 2018, p. 78, lines 16-25, p. 79, lines 1-13).**

-20-

75.     The Plaintiff testified at trial that Plaintiff had assaulted and menaced her with knives on many occasions, threatening to kill her, on one occasion he shoved against the wall and put a butcher knife to her throat.  **(Exhibit C, N.T. Direct Examination of the Erika Jones, Jury Trial, 12/12/2018, p. 78, line 25, p. 79, lines 1-20, p. 81, lines 11-19) (N.T. Cross Examination of the Complainant, Erika Jones, Jury Trial, 12/12/2018, p. 150, lines 1-20)**.

**76.**  However,  Detective Bray testified that the Complainant did not mention any prior knife assaults, rapes or assaults of any kind at any time during the investigation .**(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 150, lines 3-6).  (Exhibit D, N.T. Cross Examination of Detective Lucas Bray, Criminal Jury Trial, 12/13/2018, p. 81, lines 16-21).**  And, in fact Detective Bray did not recover any knives from his search of the home.  **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Jury Trial, 12/12/2018, p. 85, lines 5-12).**

**77.** An examination of the pen camera revealed video of Ms. Jones partially nude talking to Plaintiff about the pen camera. **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 128, lines  24-25, p. 129, lines 1-8)**.  Ms. Jones testfied that she was aware of the pen camera, as well as another device which Plaintiff had placed under the door of the bathroom.  **(Exhibit C, N.T. Direct Examination of the Erika Jones, Jury Trial, 12/12/2018, p. 83, lines 7-25, p. 84, lines 1-15)**.

78. Although  Erika Jones testified that she was aware of the recording devices in the house, including the camera pen which she confronted Plaintiff about and the home surveillance, and the Complainant was clearly aware that the sexual encounter had been recorded as she participated, by kissing Plaintiff for the camera, and admitted that Plaintiff recorded her as evidence of consensual sex because of her musings about spousal rape, Detective Bray, nevertheless, insisted that all of the recordings of her taken by Plaintiff's cell phone and pen camera were done so without her consent.  **(Exhibit C, N.T. Direct Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 145, lines 1-17)**.

79.     Detective Bray learned during the course of the investigation that the same day the Erika Jones called the police and reported that Plaintiff raped her, there had been a pre-scheduled visit by a CYS investigator to inquire about the Complainant's level of care of BR.  **(Exhibit C, N.T.  Cross Examination of Detective Lucas Bray, Criminal Jury Trial, 12/12/2018, p. 82, lines 7-16)**.

80.     Ms. Jones was treated at St. Luke's Hospital in Bethlehem, Pennsylvania, where a rape kit was performed, which showed that the Complainant was negative for bruising, scratches, lacerations and did not reveal any trauma.  **(Exhibit C, N.T. Cross Examination of Erika Jones, Criminal Jury Trial, 12/12/2018, p. 171, lines 1-7)**.

### Procedural History of Plaintiff's Criminal Case

81.      On June 22, 2017, the Plaintiff, Emilio Romero, was arrested and charged with Rape

by Forcible Compulsion, 18 Pa.C.S.A. Section 3121(a)(1), Involuntary Deviate Sexual

Intercourse by Forcible Compulsion, 18 Pa.C.S.A. Section 3123(a)(1), Aggravated Indecent

Assault without Consent, 18 Pa.C.S.A. Section 3125(a)(1), Possession of Device for

Intercept Communications, 18 Pa.C.S.A. Section 5705, Intercept Communications, 18

Pa.C.S.A. Section 5703, Invasion of Privacy, 18 Pa.C.S.A. Section 7507, Simple Assault,

18 Pa.C.S.A. Section 2701(a)(3), Terroristic Threats with Intent to Terrorize Another, 18

Pa.C.S.A. Section 2706(a)(1), Possession of an Instrument of Crime, 18 Pa.C.S.A. Section

907 and lesser included offenses, for allegedly stalking and ultimately raping his wife, Erika

Jones.  **(Exhibit J, Criminal Complaint)**

 82.    On June 24, 2017, Plaintiff was arraigned, bail was set at Two Hundred Thousand

Dollars, and Plaintiff's  preliminary hearing was scheduled for June 28, 2017.   Plaintiff's

preliminary hearing was continued until July 5, 2017.  **(Exhibit K, Criminal Docket**

**Sheets)**.

 83.    On July 5, 2017, Plaintiff was held for court on all charges, following a prelimninary

hearing, with the exception of IDSI Aggravated Indecent Assault, and PIC, following a

preliminary hearing presided by Monroe County Magisterial District Court Judge, the

Honorable Anthony D. Flugel.  Following Plaintiff's preliminary hearing, Judge Flugel

increased Plaintiff's bail to Five Hundred Thousand Dollars ($500,000.00) pursuant to a

Commonwealth motion to modify bail. **(Exhibit K, Criminal Docket Sheets).**

84.    Plaintiff's jury trial commenced on December 11, 2014.   Following the close of
the evidence, on 12/14/2018, Appellant was found not guilty of Rape Forcible Compulsion,
(F1), IDSI Forcible Compulsion, (F1), Sexual Assault, (F2), Terroristic Threats with Intent
to Terrorize Another, (M1), Simple Assault, (M2), and False Imprisonment, (M2), but
found guilty of Criminal Use of a Communications Facility, (F3), Intercept
Communications, (F3), Possession of Device for Intercept Communication, (F3),
Possession Instrument of Crime, (M1), Intentional Possession of a Controlled Substance,
(M), Invasion of Privacy, (M2), and Tamper with Fabricate Evidence.  Plaintiff's
sentencing hearing was scheduled for February 26, 2019.  **(Exhibit K, Criminal Docket
Sheets)**

85.    On December 28, 2018, Plaintiff filed a motion for modification of bail.  Plaintiff's
motion for modification of bail was denied on January 3, 2019.  **(Exhibit K, Criminal
Docket Sheets)**.

**86.**   On February 3, 2018, Plaintiff's  sentencing hearing date of February 26, 2019 was
postponed by the court and rescheduled for April 30, 2019, for a sexual violent predator
assessment.  **(Exhibit K, Criminal Docket Sheets).**

87.   On March 18, 2019, Plaintiff filed a Motion for Dismissal pursuant to Pa.R.Crim.P. 704, petitioning for dismissal of the case because of the violation of Plaintiff's right to a speedy sentencing hearing, withing 90 days of verdict, as well as a Post Verdict Motion to Arrest Judgment.   **(Exhibit K, Criminal Docket Sheets).**

88.   On April 30, 2019 Plaintiff's sentencing hearing was continued to May 3, 2019, due to a busy court calendar. The same day Plaintiff filed a Motion Challenging the Constitutionality of the Pennsylvania Sexual Registration and Notification Act. **(Exhibit K, Criminal Docket Sheets)**.

89.   On May 3, 2019, following a sentencing hearing, the trial court imposed the following sentence:  Eighteen (18) Months to Forty-eight (48) Months for Criminal Use of a Communications Facility, followed by a consecutive term of confinement  of Eighteen (18) to Forty-Eight Months for Interception of Communications, followed by a consecutive term of three years probation, followed by a consecutive term of confinement of One (1) year to Four (4) years for Possession of a Device to Intercept Communications, followed by a consecutive term of confinement of One (1) to Four (4) Years for Invasion of Privacy, all other sentences merged, yielding an aggregate cumulative sentence of Five (5) Years to Sixteen Years, followed by Three Years Probation.  **(Exhibit K, Criminal Docket Sheets)**.

90.    On May 7, 2019, the trial court issued an order denying Appellant's Motion for Arrest of Judgment and Motion to Dismiss.  **(Exhibit K, Criminal Docket Sheets)** On May 12, 2019, Plaintiff     filed a Post Sentence Motion.  **(Exhibit K, Criminal Docket Sheets)**

91.    On July 19, following a hearing on May 31, 2019, the court issued an Order denying Plaintiff's post sentencing challenge to SORNA, but did not rule on Plaintiff's challenge to the discretionary aspects of sentencing or weight of the evidence challenges.  Four days later the lower court denied Plaintiff's post sentence motion in total.  **(Exhibit K, Criminal Docket Sheets)**.

92.  On August 12, 2019, Plaintiff filed a timely Notice of Appeal.  **(Exhibit K, Criminal Docket Sheets)**.

**Collateral Damages Incurred by Plaintiff**

93.  As a result of being prosecuted, convicted, and sentenced to a minimum five year sentence, Plaintiff's house was foreclosed and sold in a Sheriff's sale, he lost his Iron Worker's job, which provided him with an income of over $100,000.00, and lost his automobile which was seized by police.  **(Exhibit A, Deposition of the Plaintiff, Emilio Romero, 9/03/2020, p. 63, lines 14-24, p. 1-14)**.

94.  Plaintiff's reputation was ruined by media coverage of his arrest and prosecution. **(Exhibit L, 6/27/2020 Newspaper and Media Accounts of Plaintiff's Arrest and Prosecution)**.

95.   The Mount Pocono police press accounts were replete with falsehoods, including the false allegation that Plaintiff committed the sexual assault with a firearm, even though he did not possess a gun, as the alleged firearm recovered from Plaintiff's home was a mere BB gun, and none of the media releases stated that thew alleged victim was his wife. **(Exhibit L)**.

## MONELL IMPLICATIONS OF DEFENDANT'S MISCONDUCT

96.   Defendants, Bray and Rackaczewski, were civil defendants in the case of **Spiess v. Pocono Mountain Regional Police Department,** USMD, a 1983 Civil Rights lawsuit wherein the Plaintiff Spiess charged bray and Rackaczewski omitted and concealed evidence that two teenaged girls that accused him and other co-defendants of forcible rape and other felonious offenses for sexual assault had recanted false allegations of sexual assault against other male defendants year earlier, as well as inconsistencies in their statements about the incident.   Eventually the accusers recanted their accusations against Spiess and the case was nolle prossed by Defendant Rackaczewsi, but not until after Spiess' preliminary hearing, which was held after Bray and Rackaczewski were aware of the girls prior false claims, and inconsistent versions of what happened in Spiess' case, facts which were not relayed by Bray or Rackaczewski at Spieth's preliminary hearing. Defendant Chief Chris Wagner was also a Defendant in the case.   Although he did not have an active role in the investigation, he was obviously aware of Defendant Bray's conduct during the case, conduct which is eerily similar to Defendant Bray's conduct in the *case sub judice.*

Respectfully submitted:


\_\_/s/ Earl Raynor
Earl Raynor, Esquire
PA Supreme Court I.D. No. 66849
1800 JFK Boulevard
Third Floor, Box 103
Philadelphia, PA 19103
(215)254-0299
Fax: (914)663-5116
earlraynor@yahoo.com

Counsel for Plaintiff
Emilio Romero

-28-