## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

EMILIO ROMERO, #NW5208,

        Plaintiff,

        v.

TOBYHANNA TOWNSHIP, et al.,

        Defendants.

CIVIL ACTION NO. 3:19-cv-01038

(SAPORITO, M.J.)

## **MEMORANDUM**

This is a fee-paid federal civil rights action, which commenced when the plaintiff, Emilio Romero, filed his original *pro se* complaint on June 19, 2019. (Doc. 1.) At the time of filing, Romero was incarcerated at the Monroe County Correctional Facility, a local jail located in Monroe County, Pennsylvania.

On December 6, 2019, now represented by counsel, the plaintiff filed an amended complaint. (Doc. 40; *see also* Doc. 37; Doc. 39.) Sorting themselves into two separately represented groups, the defendants answered the complaint, and the parties commenced discovery. (*See* Doc. 46; Doc. 49.)

On October 29, 2020, the County Defendants[1] filed a Rule 56 motion for summary judgment. (Doc. 64; *see also* Doc. 65; Doc. 70.) On October 30, 2020, the Township Defendants[2] filed a Rule 56 motion for summary judgment. (Doc. 66; *see also* Doc. 67; Doc. 68; Doc. 69; Doc. 71.) On December 22, 2020, the plaintiff filed a combined brief in opposition to both motions for summary judgment. (Doc. 80.) On December 28, 2020, the County Defendants filed a reply brief in support of their summary judgment motion. (Doc. 83.) On December 30, 2020, the Township Defendants filed a reply brief in support of their summary judgment motion. (Doc. 90.)

Both motions are now ripe for decision.

## I.   LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any

---

[1] The "County Defendants" are: Brian Webbe, a detective with the Monroe County district attorney's office; and Michael Rackaczewski, an assistant district attorney with the Monroe County district attorney's office.

[2] The "Township Defendants" are: Chris Wagner, chief of the Pocono Mountain Regional Police Department ("PMRPD"); Lucas Bray, a detective with PMRPD; and the five municipalities served by PMRPD—Tobyhanna Township, the Borough of Mount Pocono, Tunkhannock Township, Coolbaugh Township, and Barrett Township.

material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the
outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986). A dispute of material fact is "genuine" only if the evidence "is such
that a reasonable jury could return a verdict for the non-moving party."
*Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all
inferences "should be drawn in the light most favorable to the non-
moving party, and where the non-moving party's evidence contradicts the
movant's, then the non-movant's must be taken as true." *Pastore v. Bell
Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial
responsibility of informing the district court of the basis for its motion,"
and demonstrating the absence of a genuine dispute of material fact.
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes
such a showing, the non-movant must set forth specific facts, supported
by the record, demonstrating that "the evidence presents a sufficient
disagreement to require submission to the jury." *Anderson*, 477 U.S. at
251–52.

In evaluating a motion for summary judgment, the Court must first

determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary

judgment, to consider evidence that is not admissible at trial).

## II.   UNDISPUTED MATERIAL FACTS

The material facts of this case are undisputed. *See Romero v. Tobyhanna Twp.*, Civil Action No. 3:19-cv-01038, 2021 WL 4037837 (M.D. Pa. Sept. 3, 2021) (striking plaintiff's non-responsive statements of facts for failure to comply with Local Rule 56.1 and granting unopposed motions to deem defendants' statements of material facts admitted), Doc. 97.

In the early hours of June 22, 2017, two non-party PMRPD police officers—Corporal Mertz and Officer Dunlap—responded to a 9-1-1 call placed by E.J., the plaintiff's wife. E.J. told the officers that Romero had raped and assaulted her at gunpoint after she confronted him about a "pen camera" she had found in her bedroom. The officers obtained a signed written statement from E.J., which they later provided to Detective Bray, the PMRPD detective on call at the time. The officers transported E.J. to a hospital for a rape examination while Detective Bray, at the police station, prepared a search warrant application and contacted his sergeant and other detectives to assist in the investigation. According to an affidavit of probable cause prepared by Detective Bray

later that same day:

On 6/22/2017 at approximately 0346 hours, PMRPD Officers were dispatched to respond to 1117 Kensington Road for a reported rape and assault. Officers arrived on the scene and met with the victim, identified a[s] EJ. She reported that she was raped at gun point and assaulted by her husband Emilio Romero. She provided the following statement to police:

"At around 8:30 PM I found a camera pen in my room and confronted Emilio Romero about putting the camera in my room and a slight argument happened. I came out of my room to go to the bathroom and Emilio Romero was standing in the hallway and I asked him why was he standing in the hallway and he pulled out a big black gun and pointed it at me and demanded me to go in my bedroom. He put the gun on the back of my head and made me go into my bedroom. I went in the bedroom and he kept telling me he was going to kill me. After repeated threats he put the gun to the back of my head thru a pillow and pulled the trigger. Nothing happened and he told me I was lucky that time. He demanded me to remove my clothes while pointing the gun at me. I was begging him no[t] to but he kept threatening me. Then my daughter kept texting me and he went to go check on her. At that time I locked the door and pretended to call the police, then he came and busted the door down acting like he was going to hit me with the gun. Then he proceeded to take my clothes off made me get on my bed and proceeded to rape me while I cried. He started recording it on his phone then he made me turn around and he started to rape me from behind threatening to go in my anus all while he recorded it on his phone. Then he ejaculated in me and let me go. I wiped his cum off with my panties and went in the bathroom and cleaned up."

EJ advised that she waited until Romero left for work to contact police. She advised that he works in NY and left early this morning in his silver Acura bearing pa tag # KJZ2124 to go to work and she was not sure if he left with the gun or not. She advised that he has a safe in his room and the gun could be in there.

She also believed that he was not legally allowed to possess firearms. She also showed police where there is a doorbell camera and advised that he has surveillance set up in the house but she is unaware of where all the cameras are and believed that the[y] send video or pictures to his cellular phone. EJ's 8 year old daughter was also interviewed by police and corroborated he[r] mother[']s statement. We also viewed the text communication from her that was mentioned earlier in her statement. Following the rape and Romero's arrival at work in NY, he has texted [EJ] and sent video[]s of himself at work from his cellular phone. EJ was transported to the emergency room for a rape exam. EJ provided voluntary consent to search the residence, however after consultation with ADA Bernal, it was decided that a search warrant application be prepared.

Officers secured the scene and I prepared the search warrant application. A criminal history check on Emilio Romero revealed an extensive and extremely violent history which included arrests for homicide and drug trafficking offenses. It also shows that he has a previous alias/aka as "LEADPIPE Romero". His arrest record included the following:

On December 29, 1991, Romero was charged by NYCPD with Murder with intention, Criminal possession of a dangerous weapon, criminal use of a firearm, and reckless endangerment. Disposition for the above case was unreported. On February 8, 1994, Romero was charged by the Buffalo City Police

Department for the following: Criminal possession of a controlled substance with intent to sell, Criminal use of drug paraphernalia and criminal possession controlled substance. Disposition for the above case was unreported. On September 1, 1995, Romero was charged by the NYCPD for the following: Murder with intention, Criminal possession of a weapon, and Assault with intent to cause serious injury with a weapon. Dispostion: On September 27, 1995[,] Rome[r]o plead[ed] guilty to Murder with intention, a felony],] and [was] sentenced to 2 years to 6 years. On May 22, 2001, Romero was charged by the NY FBI for Drug Conspiracy. The disposition [was] guilty. Both of his apparent convictions would disqualify Romero from firearm possession in Pennsylvania under 18 CSA 6105 Persons not to possess firearms, making it illegal for him to have any guns in the home.

A search warrant for the Romero/EJ home was reviewed and approved by ADA Bernal and taken before MDJ Fluegel. MDJ Fluegel issued the search warrant and at approximately 1000 hours Detectives Bohelm, Venneman, and Officer Vacarro assisted me with its execution. I photographed the scene using digital photography and the pictures will be downloaded to the server. I noted the doorbell camera as we[] entered the homje by the front door. Inside the home I also noted damage to a doorway that was broken during the rape and assault incident. We located a black beretta replica handgun locked in a small safe with[]in Romero's room. We also located the packaging materials for the gun which evidenced that he had just recently purchased it. We also located the packaging for several pieces of covert recording devices, specifically the pen that was mentioned before by the victim as well as an electrical outlet hidden video recorder device, and a light bulb device that was a surreptitious video recording device that we actually

found installed without EJ['s] knowledge in her bedroom. We also located mail packaging materials from Amazon which showed that he had just purchased the devices within the past week. We also located several opened packages for mini sd cards used with these devices to store the recorded video. We also located the underwear worn by the victim and secured them as evidence as well as a dildo that he used on her during the rape. During the rape exam, EJ provided further details of the assault which included details that he touched and kissed her breasts, that there was an attempted penetration of her anus with his penis, the use of the dildo that penetrated her vaginally as well as his penis, and that he had also penetrated her vaginally with his mouth and tongue. She revealed that she has been with Romero since she was 20 years old. They have lived together but in separate rooms for approximately (7) years now and that Romero has be[e]n very suspicious and paranoid of her and accused her of cheating recently. Also of note in the search warrant findings was that there was an abundance of several opened and unopened packages of capsules called "Vshot male endurance formula", "Stamin" and "Herb Viagra", taken to produce erectile stamina. Also located were (5) xanex bars and (2) partial bars found within a dime size baggie within Romero's room. Evidence was collected and logged into PMRPD evidence by Detective Boheim and prepared for laboratory analysis with the rape exam evidence.

(Doc. 69-4 (criminal complaint); Doc. 65-1, at 26–34 (same); *see also id.* at 84 (EJ's handwritten statement).)

Based on the affidavit of probable cause and the evidence described within, Detective Bray filed a criminal complaint on June 22, 2017,

charging Romero with rape by force, involuntary deviate sexual intercourse by forcible compulsion, attempted involuntary deviate sexual intercourse, aggravated indecent assault without consent, sexual assault, criminal use of a communication facility, possession of the instrument of a crime with intent to employ it criminally, terroristic threats, simple assault, and possession of a controlled substance.[3] Prior to filing the criminal complaint, Bray conferred with ADA Rakaczewski, who approved the charges based on the information provided by Detective Bray. Rakaczewski, however, did not participate in the factual investigation prior to the filing of charges. Detective Webbe did not participate at all in the filing of criminal charges against Romero.

An arrest warrant for Romero was issued by a state magisterial district judge on June 22, 2017. Romero was arrested two days later, on June 24, 2017. He was interviewed by Detective Bray at PMRPD headquarters. The interview was audio- and videorecorded. Prior to the interview, Romero was read his *Miranda* rights, and he waived his rights and agreed to answer questions. Romero remained in custody throughout his criminal proceedings because he was unable to post bail.

---

[3] Additional charges appear to have been added at a later date.

On July 5, 2017, Romero appeared before a state magisterial district judge for a preliminary hearing. ADA Rakaczewski represented the Commonwealth and Detective Bray provided testimony. The Commonwealth also presented a video recording of the rape itself, recovered from Romero's cellphone. Romero had attempted to delete the video, but investigators had been able to recover it nonetheless. Based on this testimony and evidence, the state magisterial district judge found sufficient evidence to support a *prima facie* case against Romero and bound the charges over for trial in the court of common pleas.

Because EJ had reported that Romero filmed her with his cellphone, PMRPD had enlisted the assistance of Detective Webbe, a computer forensics expert employed with the county district attorney's office. Webbe was retained for the limited purpose of examining Romero's cellphone and testifying about his findings at trial. When Webbe examined Romero's phone, he was able to recover videos that Romero had attempted to delete, including video of the rape itself. This and other videos recovered from the plaintiff's cellphone were authenticated by Detective Webbe and played for the jury at Romero's trial.

The rape video recovered from Romero's phone shows EJ crying

while Romero filmed himself having sex with her. In the video, Romero can be heard to say, "I'm trying to save you," "you needed this," and "stop your crying now." The video depicts Romero threatening EJ multiple times that "if you cry, I'm going to put it in your butt." Meanwhile, EJ cries throughout the video, screams in pain, says multiple times that "you're hurting me," and she says, "I can't do this." Detective Webbe recovered several other graphic videos in which video of EJ was recorded while she was undressing, seated on the toilet, and unclothed on her bed.

While awaiting trial, Romero filed a motion to compel discovery, asserting that the Commonwealth had failed to produce all recovered recordings to the defense. The motion was ultimately denied as moot after the prosecution provided the requested discovery materials. Prior to trial, all audio and video recordings recovered from Romero's cellphone and other recording devices were produced.

On December 14, 2018, following a multi-day trial, a jury acquitted Romero of all sex offenses, but found him guilty of criminal use of a communication facility, possession of the instrument of a crime with intent to employ it criminally, possession of a controlled substance, interception of communications, possession of a device for intercepting

communications, invasion of privacy, and tampering with evidence. ADA Rakaczewski prosecuted the case on behalf of the Commonwealth. Detective Bray testified regarding his investigation, and Detective Webbe testified regarding his recovery of deleted videos from Romero's cellphone. The rape video and other video evidence was presented to the jury. Evidence of Romero's internet search history was presented, which indicated that Romero had searched for information on Pennsylvania marital rape laws prior to the incident. Serology reports confirmed the presence of seminal material on the vaginal and anal swabs taken during EJ's rape exam.[4] In defense to the rape charges, Romero's defense counsel—who is also counsel of record in this case—had argued that the sex depicted was consensual and just "rough sex."

On May 3, 2019, the state trial court sentenced Romero to serve five to twelve years of imprisonment, followed by three years of probation. *Commonwealth v. Romero*, Docket No. CP-45-CR-0001534-2017 (Monroe Cty. (Pa.) C.C.P.), *aff'd in part and vacated in part*, 251 A.3d 1269 (Pa. Super. Ct. Mar. 29, 2021), *petition for allocatur filed*, No. 215 MAL 2021

---

[4] We note that an expert witness also testified at trial that the DNA profiles extracted from these swabs were consistent with Romero's DNA profile. (*See* Doc. 69-1, at 21–26.)

(Pa. Apr. 28, 2021).[5] Romero was given credit for 678 days of time served.[6] *Id.* In addition, the sentencing court ordered Romero to register as a sex offender under Pennsylvania's Sex Offender Registration and Notification Act ("SORNA"). *Id.* Romero took an appeal to the Superior Court of Pennsylvania, which vacated the trial court's order with respect to SORNA registration, but affirmed Romero's sentence in all other respects. *Commonwealth v. Romero*, 251 A.3d 1269, 2021 WL 1174721 (Pa. Super Ct. Mar. 29, 2021) (unpublished table decision), *petition for allocatur filed*, No. 215 MAL 2021 (Pa. Apr. 28, 2021). Romero filed a petition for allocatur with the Supreme Court of Pennsylvania, which remains pending. *Commonwealth v. Romero*, No. 215 MAL 2021 (Pa. filed Apr. 28, 2021).

At his deposition in this case, Romero conceded that he had no evidence to support his racial discrimination claims against ADA Rakazcweski or Detective Webbe, and he testified that he did not recall

---

[5] A district court, of course, may properly take judicial notice of state court records, as well as its own. *See* Fed. R. Evid. 201; *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007); *Ernst v. Child & Youth Servs. of Chester Cty.*, 108 F.3d 486, 498–99 (3d Cir. 1997); *Pennsylvania v. Brown*, 373 F.2d 771, 778 (3d Cir. 1967).

[6] This credit covers the entire period between the date of his arrest on June 24, 2017, and the date of his sentencing on May 3, 2019.

Detective Bray using any racially offensive language but based his subjective belief that Bray had discriminated against him on the basis of race on the detective's statements during interrogation that he believed Romero was lying, that he believed Romero was guilty, and referencing Romero's alleged gang affiliations.

With respect to Romero's false light tort claims, Detective Webbe made no statements to the press about the charges against Romero.[7] At his deposition, Romero conceded that he never saw a direct quote in any newspaper from Detective Bray discussing his case or his alleged guilt, but rather, any statements by Bray were contained only in legal pleadings or testimonial evidence.

With respect to Romero's § 1983 *Monell* and supervisory liability claims, Romero adduced no evidence to support such claims, conceding at deposition that he had no evidence of any particular PMRPD policy or custom that caused his alleged constitutional injury, nor any evidence of personal involvement by Chief Wagner other than his general supervisory role with respect to the police department.

---

[7] Webbe's only public statements appear to be his testimony at trial.

III.   **DISCUSSION**

Romero has brought this federal civil rights action primarily under

42 U.S.C. § 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State or
> Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States
> or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but

instead provides remedies for rights established elsewhere. *City of*

*Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983

claim, a plaintiff must establish that the defendants, acting under color

of state law, deprived the plaintiff of a right secured by the United States

Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.

1995).

Here, the plaintiff has asserted multiple federal civil rights claims,

as well as several supplemental state-law tort claims. In Count I, Romero

has asserted a § 1983 malicious prosecution claim against defendants

Bray, Webbe, and Rakaczewski, asserting that they initiated criminal

proceedings against him without probable cause, in violation of his rights under the Fourth Amendment.[8] In Count II, Romero has asserted equal protection and racial discrimination claims against Bray and Webbe, asserting that they initiated criminal proceedings against him based on his race, in violation of his rights under the equal protection clause of the Fourteenth Amendment and under 42 U.S.C. § 1981. In Count III, Romero has asserted municipal and supervisory liability claims against defendant Wagner and the municipal defendants—Tobyhanna Township, the Borough of Mount Pocono, Tunkhannock Township, Coolbaugh Township, and Barrett Township—based on the malicious prosecution and racial discrimination claims set forth in Counts I and II. In Counts IV, V, and VI, Romero has asserted state-law false light invasion of privacy, intentional infliction of emotional distress, and

---

[8] Count I of the amended complaint also references the plaintiff's Fourteenth Amendment due process rights, but it is well established that "it is the Fourth Amendment, not the Fourteenth Amendment, which is the proper vehicle for addressing any unlawful pretrial deprivations of liberty incidental to criminal proceedings." *Mekata v. Kamoie*, 955 F. Supp. 2d 345, 365 (M.D. Pa. 2013). This is the "more specific provision" or "explicit source rule," derived from the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266 (1994). *See id.* A malicious prosecution claim under the Fourteenth Amendment due process clause is thus legally meritless.

common law malicious prosecution tort claims against Bray and Webbe, based on the initiation of criminal charges against him. For relief, Romero seeks compensatory and punitive damages.

## A. Prosecutorial Immunity

In Count I of the amended complaint, the plaintiff has asserted a § 1983 malicious prosecution claim against ADA Rakaczewski. This is the only claim directed against the prosecutor. The County Defendants have moved for summary judgment on this claim on the ground that Rakaczewski is entitled to absolute prosecutorial immunity, and the plaintiff has expressly conceded this issue in his brief in opposition, requesting that the court "dismiss the case against Mr. Rackaczewski [*sic*]." (*See* Doc. 80, at 31–32.) Under these circumstances, we find that the plaintiff has waived his claim against ADA Rakaczewski, entitling the prosecutor to summary judgment. *See Rife v. Borough of Dauphin*, 647 F. Supp. 2d 431, 441–42 (M.D. Pa. 2009). Moreover, the plaintiff's claim against ADA Rakaczewski is based solely on his conduct as an advocate in the judicial phase of the criminal process—that is, initiating a prosecution and presenting the state's case—and thus the plaintiff's § 1983 claim is indeed barred by absolute prosecutorial immunity. *See*

*Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976); *see also Kulwicki v. Dawson*, 969 F.2d 1454, 1465 (3d Cir. 1992) (noting that this absolute immunity "extends to 'the preparation necessary to present a case,' and this includes the 'obtaining, reviewing, and evaluation of evidence'").

Accordingly, the motion for summary judgment will be granted with respect to the plaintiff's § 1983 malicious prosecution claim against defendant Rakaczewski, set forth in Count I of the amended complaint.

### B. Witness Immunity

In Counts I and II, IV, V, and VI of the amended complaint, the plaintiff has asserted various federal civil rights and state-law tort claims against Detective Webbe. It is undisputed that Webbe played no role in the initiation of criminal proceedings against the plaintiff, and that his only role was as a computer forensics expert who recovered and testified about digital video evidence recorded by the plaintiff on his cellphone.[9] The County Defendants have moved for summary judgment on this claim on the ground that Webbe is entitled to absolute immunity as a court witness. Based on the undisputed facts of record, it is clear to us that

---

[9] The plaintiff's claims against Webbe appear to be based primarily on an allegation that Webbe provided perjured testimony concerning the chain of custody with respect to Romero's cellphone.

Detective Webbe is indeed entitled to absolute immunity from these claims as a matter of law. *See Briscoe v. LaHue*, 460 U.S. 325, 345–46 (1983); *DeBerry v. Younes*, 725 Fed. App'x 87, 88 (3d Cir. 2018) (per curiam).[10]

Accordingly, the motion for summary judgment will be granted with respect to the plaintiff's federal civil rights and state-law tort claims against defendant Webbe, set forth in Counts I, II, IV, V, and VI of the amended complaint.

### C. Equal Protection

In Count II of the amended complaint, the plaintiff has asserted a § 1983 equal protection claim against Detective Bray, asserting that the charging officer's conduct violated his Fourteenth Amendment right to equal protection of the law.

---

[10] The plaintiff's brief also appears to argue that Detective Webbe should also be found liable based on the Commonwealth's initial failure to disclose certain audio recordings recovered from Romero's cellphone. As noted in our recitation of the undisputed material facts, these recordings were ultimately disclosed to Romero prior to trial. Moreover, the undisputed facts establish that, as a witness, Detective Webbe himself had *no* discovery disclosure obligations whatsoever. But to the extent Detective Webbe might have had any such obligation, he would be entitled to absolute quasi-judicial immunity from claims arising from that obligation as well. *See Kamienski v. Ford*, 844 Fed. App'x 520, 523 (3d Cir. 2021).

The equal protection clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. To prevail on an equal protection claim, a plaintiff must demonstrate that he was treated differently from persons who are similarly situated, and that this discrimination was purposeful or intentional rather than incidental. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410, 423–24 (3d Cir. 2000).

Standing alone, the mere fact that these criminal charges were brought against Romero, an African-American male, is insufficient to prove discriminatory intent. *See Rembert v. Monroe Twp. Bd. of Educ.*, Civil Action No. 95-4818 (JEI), 1997 WL 189318, at *7 (D.N.J. Apr. 14, 1997). Romero must adduce evidence that similarly situated non-African-American persons have been treated differently, whether by Detective Bray personally, or by the PMRPD police force in general. Romero has failed to identify any such evidence, and we are unable to discern any in the record before us.

Accordingly, the motion for summary judgment will be granted with

respect to the plaintiff's § 1983 equal protection claim against defendant Bray, set forth in Count II of the amended complaint.

### D. Section 1981 Claim

In Count II of the amended complaint, the plaintiff has also asserted a § 1981 racial discrimination claim against Detective Bray, asserting that the charging officer's racially discriminatory conduct has denied Romero the full and equal benefit of the laws as is enjoyed by white persons, and inflicted punishment or penalties beyond those to which white persons are subject.

Section 1981 was enacted to "protect[] against discrimination on the basis of race or alienage." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1232 (7th Cir. 1984), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005). The statute provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

"To establish a right to relief under § 1981, a plaintiff must show

- 22 -

(1) that he belongs to a racial minority; (2) 'an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in' § 1981 . . . ." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002). "Section 1981 is not confined to contractual matters, though it is most often invoked in that context. It deals with the protection of a limited range of civil rights, including the right to make and enforce contracts, to sue, and to give evidence." *Bell*, 746 F.2d at 1232 (citation omitted). It also guarantees a right to equal benefit of the laws and to like punishment, irrespective of race. *See Mahone v. Waddle*, 564 F.2d 1018, 1027–28 (3d Cir. 1977); *Grier v. Galinac*, 740 F. Supp. 338, 341–43 (M.D. Pa. 1990) (addressing § 1981 claim that plaintiff would not have been stopped and questioned by police defendants if he had been white).

"To prevail on a claim under 42 U.S.C. § 1981, the plaintiff must present evidence of defendant's discriminatory intent, as that section reaches only purposeful discrimination." *See Taylor v. City of St. Louis*, 702 F.2d 695, 697 (8th Cir. 1983) (per curiam). As with his equal protection claim, the single incident involving Romero himself is insufficient to prove discriminatory intent under § 1981. *See Rembert*,

1997 WL 189318, at *7. Romero has failed to identify any other facts or evidence whatsoever to support his § 1981 claim.

Accordingly, the motion for summary judgment will be granted with respect to the plaintiff's § 1981 racial discrimination claim against defendant Bray, set forth in Count II of the amended complaint.

### E. Malicious Prosecution

In Count I of the amended complaint, the plaintiff has asserted a § 1983 malicious prosecution claim against Detective Bray, asserting that Bray initiated criminal proceedings against him without probable cause, in violation of his Fourth Amendment right to be free from unreasonable seizures, and the plaintiff has asserted a parallel common law malicious prosecution claim against the detective in Count VI. In particular, Romero claims that Bray lacked probable cause to charge him with rape and other sex offenses for which Romero was ultimately acquitted following a jury trial. Romero was convicted, however, of several other felony and misdemeanor offenses arising out of the same offense conduct, for which he was sentenced and continues to serve a term of years of imprisonment. He has appealed his sentence, and that appeal remains pending before the state appellate courts.

To succeed on a malicious prosecution claim under 42 U.S.C. § 1983, Romero must show that: (1) Bray initiated a criminal proceeding; (2) the criminal proceeding ended in Romero's favor; (3) the proceeding was initiated without probable cause; (4) Bray acted maliciously or for a purpose other than bringing Romero to justice; and (5) Romero suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *See Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003). A Pennsylvania state-law claim for malicious prosecution parallels the federal § 1983 claim, requiring proof of the first four elements. *See Kossler v. Crisanti*, 564 F.3d 181, 186 n.2 (3d Cir. 2009) (en banc); *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 791 (3d Cir. 2000). Here, the plaintiff's claim founders on all but the second factor.

First, Romero has failed to establish that he was seized within the meaning of the Fourth Amendment as a consequence of the rape and sex offense charges for which he was eventually acquitted.[11] It is beyond dispute that, while Romero was acquitted of the sex offenses with which he was charged, he was convicted by that same jury of several other

---

[11] This factor is applicable to the federal § 1983 claim only.

felony and misdemeanor offenses arising out of the very same nexus of facts. He was sentenced to imprisonment for a period of years, and his entire period of pretrial detention was credited toward that sentence. Although subject to a pending state court appeal, Romero remains currently imprisoned, serving that still-valid criminal sentence. Because he was found guilty of these other charges and his entire period of incarceration is attributed to that still-valid sentence, his pretrial and post-conviction incarceration simply do not constitute a seizure as a consequence of the rape and sex offense charges for he was acquitted. *See Shelley v. Wilson*, 152 Fed. App'x 126, 128–29 (3d Cir. 2005) (per curiam).

Second, in cases where a plaintiff has sued a police officer for malicious prosecution, the plaintiff bears the burden of showing that the police officer "initiated" the criminal proceedings being challenged. *Weaver v. Beveridge*, No. 09-CV-2357, 2012 WL 7964544, at *7 (M.D. Pa. Sept. 12, 2012). This is because, in the typical case, it is a prosecutor, not a police officer, who "initiates" criminal proceedings against an individual. *Id.* As we have previously held, "a plaintiff can only proceed against a police officer under a malicious prosecution theory if the officer knowingly provided false information to the prosecutor or otherwise

interfered with the prosecutor's informed discretion." *Id.* (citing *Domenech v. City of Philadelphia*, No. 06-1325, 2009 WL 1109316, *8 (E.D. Pa. Apr. 23, 2009) (internal quotation marks omitted)); *see also Merrero v. Micewski*, No. 96–8534, 1998 WL 414724, at *6–*7 (E.D. Pa. July 22, 1998) ("A police officer may only be held to have 'initiated' a criminal proceeding if he knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion."). Here, Romero has failed to adduce any evidence whatsoever that Detective Bray provided false information—knowingly or not—to the prosecutor, ADA Rakaczewski, nor that he otherwise interfered in the prosecutor's informed discretion. Romero has relied exclusively on his own subjective belief that the victim statement given to police by EJ was inherently unbelievable—a characterization we find that no reasonable jury could embrace.[12]

Third, Romero has failed to adduce any evidence whatsoever that

---

[12] As discussed more fully below, the premise of the plaintiff's claim is that later-acquired evidence sufficiently undermined the credibility of EJ's account of events to permit a jury to find him not guilty of rape and other sex offense charges against him. But that evidence was not available to inform the affidavit of probable cause prepared by Detective Bray for ADA Rakaczewski's review and approval on June 22, 2017.

Detective Bray initiated criminal proceedings against Romero out of malice or for a purpose other than bringing Romero to justice. As discussed below, the facts ascertained by Detective Bray in his initial investigation, leading up to preparation of his affidavit of probable cause on June 22, 2017, clearly provide probable cause for the rape and sex offense charges set out in the criminal complaint. Detective Bray has attested in his affidavit that he prepared the criminal complaint and affidavit of probable cause in good faith, based on the facts and circumstances made known to him and his fellow police officers through their reasonable initial investigation. He has attested that he had no prior exposure to Romero, and thus no malice toward him, and that Romero's race was not a factor at all in Bray's role in the criminal prosecution. Romero has failed to point to any contrary evidence at all.

Finally, it is clear from the record on summary judgment that, on June 22, 2017, authorities had probable cause to initiate the criminal proceedings against Romero. "The proper inquiry in a section 1983 claim based on false arrest or misuse of the criminal process is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed

the offense." *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988). "[P]robable cause . . . exists when the facts and circumstances within the [charging] officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be [charged]." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 467 (3d Cir. 2016); *see also Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000) ("Probable cause exists if there is a 'fair probability' that the person committed the crime at issue."); *Merkle*, 211 F.3d at 789 (noting that probable cause is "defined in terms and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing a crime"). Whether the plaintiff actually committed the charged offense or was acquitted of the charge is irrelevant to a probable cause analysis. *See Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005) (noting that the evidentiary standard for probable cause is "significantly lower than the standard which is required for conviction").

> As the Supreme Court has observed, "in dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." For this reason, the Court has

eschewed "any rigid demand that specific 'tests' be satisfied" and has instead prescribed a "totality-of-the-circumstances approach" to the probable cause determination. That determination is necessarily fact-intensive, and it will usually be appropriate for a jury to determine whether probable cause existed. Nevertheless, summary judgment may be granted on the question of probable cause if a court concludes that "the evidence, viewed most favorably to the nonmoving party, reasonably would not support a contrary factual finding."

*Dempsey*, 834 F.3d at 467–68 (quoting *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983), and *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)) (brackets and ellipsis omitted).

Here, Detective Bray prepared the criminal complaint and his affidavit of probable cause in support based on a detailed statement by the victim, alleging that Romero had brandished a gun and sexually assaulted her. She specifically identified her husband, Romero, as her attacker. Police officers interviewed the victim's minor daughter, who was present in the home at the time of the incident, and the daughter corroborated her mother's statement. Police reviewed text messages on the victim's cellphone that further corroborated her account of events. A review of Romero's criminal background revealed a history of violent crime and that he was a felon prohibited from legal possession of a

firearm. After a search warrant was obtained, police found surveillance equipment, damage to a doorway, a replica handgun, the victim's underwear, and a sex toy—all consistent with the victim's description of the incident—as well as a quantity of illegal controlled substances. The victim underwent a rape exam at a hospital, during which she provided additional details about the incident. At the time of this initial investigation, which preceded the initiation of criminal proceedings by a matter of hours, the investigating officers had no reason to disbelieve her. They were unaware of any inconsistent evidence, and there was nothing to suggest that she was an unreliable witness. Absent "[i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers" to outweigh it, "a positive identification by a victim witness, without more, would usually be sufficient to establish probable cause." *Wilson*, 212 F.3d at 790; *see also Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997) ("When a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause to arrest.") (assault victim identified her husband as attacker).

The plaintiff suggests that probable cause was lacking because

Detective Bray failed to investigate further and consider the audio and video recordings, and other evidence, that ultimately led a jury to acquit him on the rape and other sex offenses charges. But police have no obligation to obtain exculpatory evidence prior to initiating a criminal proceeding where the arresting officer was unaware of it at the time of charging. *See Waters v. Cheltenham Twp.*, 700 Fed. App'x 149, 153 (3d Cir. 2017) ("[E]ven though the footage ultimately led to the withdrawal of criminal charges, we still determine whether the proceeding was initiated without probable cause 'based on the information available to officers *at the time the arrest warrant was sought*.'") (brackets omitted); *see also Dempsey*, 834 F.3d at 471 ("[W]e look only to the information available to the officer at the time of the swearing of the affidavit of probable cause."); *Merkle*, 211 F.3d at 790 n.8 ("[The arresting officer] was not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed."); *Rodriguez v. Scranton Police Dep't*, No. 3:10cv2022, 2013 WL 74292, at *9 (M.D. Pa. Jan. 4, 2013) ("[T]he mere absence of specific types of incriminating evidence, such as forensic evidence or third-party eyewitnesses, does not negate the probable cause established by other

types of incriminating evidence."); *cf. Patterson v. Sch. Dist. of Philadelphia*, No. 99-CV-4792, 2000 WL 1020332, at *6 (E.D. Pa. July 19, 2000) ("Once a police officer has discovered sufficient facts to establish probable cause, the officer has no constitutional duty to further investigate in hopes of finding exculpatory evidence.").

Viewing the evidence in the light most favorable to the plaintiff, we find that, based on the evidence known to Detective Bray at the time when he prepared the criminal complaint, no reasonable jury could find that defendant Bray lacked probable cause to initiate criminal proceedings against the plaintiff.

Accordingly, the motion for summary judgment will be granted with respect to the plaintiff's § 1983 and state-law malicious prosecution claims against defendant Bray, set forth in Counts I and VI of the amended complaint.

### F. Municipal Liability

In Count III of the amended complaint, the plaintiff seeks to hold Detective Bray's municipal employers liable for the alleged constitutional violations as well.

"On its face, § 1983 makes liable 'every person' who deprives

another of civil rights under color of state law." *Burns v. Reid*, 500 U.S. 478, 497 (1991) (Scalia, J., concurring in part and dissenting in part). In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court of the United States established that municipalities and other local governmental units are included among those "persons" subject to liability under § 1983. *Id.* at 690.

But "[u]nder *Monell*, a municipality cannot be subjected to liability solely because injuries were inflicted by its agents or employees." *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 249 (3d Cir. 2007). Rather, a municipality can be liable under § 1983 only if the conduct alleged to be unconstitutional either "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 690–91. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."

*Jiminez*, 503 F.3d at 249. "A plaintiff must identify the challenged policy, attribute it to the [municipality] itself, and show a causal link between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984). Alternatively, "[a] municipality may be held liable under § 1983 for failure to train, monitor, or supervise, [but] only where the plaintiff can 'identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred.'" *Watson*, 629 F. Supp. 2d at 487 (quoting *Gilles v. Davis*, 427 F.3d 197, 207 n.7 (3d Cir. 2005)); *see also Nawuoh*, 802 F. Supp. 2d at 645 ("While municipal liability under § 1983 originally hinged on affirmative policies, or customs, modern jurisprudence has extended it to a [municipality]'s failure to train, supervise and discipline its officers.").

The plaintiff in this case has failed to identify any affirmative policy or custom adopted or promulgated by PMRPD or its sponsoring municipalities. Although the amended complaint does allege, in cursory fashion, that PMRPD and its sponsoring municipalities failed to

adequately train, monitor, and supervise their employees, Romero has failed to adduce any evidence regarding specific training, or its absence, that can be said to have caused the alleged constitutional violations. Moreover, Romero has failed to adduce any evidence from which a reasonable factfinder might infer actual or constructive knowledge by municipal policymakers of a previous pattern of similar violations, or of the allegedly inadequate training—a prerequisite to imposing § 1983 liability on a municipality. *See Colburn v. Upper Darby Twp.*, 838 F.2d 663, 672 (3d Cir. 1988); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("[A] single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Brown v. City of Pittsburgh*, 586 F.3d 263, 292–93 (3d Cir. 2009) (recognizing that where no explicit policy is identified, "'more proof than the single incident will be necessary' to establish a causal connection between the incident and some municipal policy").

Moreover, "for there to be municipal liability, there . . . must be a violation of the plaintiff's constitutional rights." *Brown v. Pa. Dep't of*

*Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003). Because Romero has failed to establish a federal civil rights claim against Detective Bray or any other individual employee of PMRPD, he simply cannot, as a matter of law, establish a *Monell* municipal liability claim against the municipal defendants—Tobyhanna Township, the Borough of Mount Pocono, Tunkhannock Township, Coolbaugh Township, and Barrett Township. *See id.*; *Startzell v. City of Philadelphia, Pa.*, 533 F.3d 183, 204 (3d Cir. 2008).

Accordingly, the motion for summary judgment will be granted with respect to the plaintiff's § 1983 *Monell* municipal liability claims against defendants Tobyhanna Township, the Borough of Mount Pocono, Tunkhannock Township, Coolbaugh Township, and Barrett Township, set forth in Count III of the amended complaint.

### G. Supervisory Liability

In Count III of the amended complaint, the plaintiff also seeks to hold Chief Wagner liable for the alleged constitutional violations, based on his role as the PMRPD chief of police.

But it is well-established that "[c]ivil rights claims cannot be premised on a theory of *respondeat superior*. Rather, each named

defendant must be shown . . . to have been personally involved in the events or occurrences which underlie a claim." *Millbrook v. United States*, 8 F. Supp. 3d 601, 613 (M.D. Pa. 2014) (citation omitted). "A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007).

Typically, personal involvement may be established through: (1) personal direction or actual participation by the defendant in the misconduct; or (2) knowledge of and acquiescence in the misconduct. *Id.* Romero has failed to adduce any evidence whatsoever that Chief Wagner personally directed or actually participated in the investigation or charging decision, nor has he adduced any evidence that Chief Wagner contemporaneously knew of and acquiesced in this conduct by Detective Bray or other PMRPD employees. As previously explained by the Third Circuit:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made

with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Alternatively, § 1983 liability may result if a supervising defendant caused a subordinate to violate another's constitutional rights through the execution of an official policy or settled informal custom. *See Sample v. Diecks*, 885 F.2d 1099, 1117–18 (3d Cir. 1989).

> [T]o hold a supervisor liable because his policies or practices led to [a constitutional] violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the [constitutional] injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice.

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 134 (3d Cir. 2001) (citing *Sample*, 885 F.2d at 1118). But as noted above, Romero has failed to establish the existence of a policy, practice, or custom of any sort with respect to the the alleged constitutional violations. Moreover, Romero has failed to adduce any evidence to establish that Chief Wagner was aware of any unreasonable risk that his subordinates might violate the constitutional rights of a suspect in circumstances similar to those of the plaintiff, that he was indifferent to such a risk, or that any injury actually resulted from

such conduct. *See Doneker v. Cty. of Bucks*, Civil Action No. 13-1534, 2014 WL 2586968, at *7–*11 (E.D. Pa. June 10, 2014).

Accordingly, the motion for summary judgment will be granted with respect to the plaintiff's § 1983 supervisory liability claim against defendant Wagner, set forth in Count III of the amended complaint.

## H. False Light

In Count IV of the amended complaint, the plaintiff has asserted a state-law false light tort claim against Detective Bray, asserting that the detective's initiation of rape and sex offense charges against Romero without probable cause, which was then depicted in local media, placed Romero in a false light before the public.

To establish a claim for false light liability in Pennsylvania, a plaintiff must show that: (1) the defendant published material that is not true; (2) the material is highly offensive to a reasonable person; and (3) the defendant acted with knowledge or in reckless disregard of the falsity of the material or the false light in which it would place the plaintiff. *See Anderson v. Perez*, 677 Fed. App'x 49, 52 (3d Cir. 2017). "Mere negligence is not enough to support a claim for false light invasion of privacy." *Id.* at 52–53. Alternatively, under Pennsylvania law, a false light claim can be

supported by proof of the publication of information that, while itself true, tends to imply something false. *See Larsen v. Philadelphia Newspapers, Inc.*, 543 A.2d 1181, 1189 (Pa. Super. Ct. 1988). To prevail under such a theory, a plaintiff must establish that the defendant created a false impression by knowingly or recklessly publicizing selective pieces of true information. *See id.*

The plaintiff's false light claim is explicitly premised upon a lack of probable cause for the rape and sex offense charges that were brought against him. As we have found, however, even when viewed in the light most favorable to the plaintiff, the facts of record clearly establish that Detective Bray had probable cause to initiate criminal proceedings against Romero for rape and other sex offenses, and no reasonable jury could find otherwise. Moreover, the plaintiff has failed utterly to adduce any evidence that, in doing so, Detective Bray acted with knowledge or in reckless disregard for the falsity of the information conveyed in the criminal complaint, nor that he knowingly or recklessly publicized selective pieces of true information to place the plaintiff in a false light.

Accordingly, the motion for summary judgment will be granted with respect to the plaintiff's state-law false light tort claim against defendant

Bray, set forth in Count IV of the amended complaint.

## I.  Intentional Infliction of Emotional Distress

In Count V of the amended complaint, the plaintiff has asserted a state-law intentional infliction of emotional distress tort claim against Detective Bray, asserting that unspecified conduct by this defendant was outrageous, intentional or reckless, and caused Romero to suffer emotional distress.

Under Pennsylvania law, to prevail on an intentional infliction of emotional distress claim, a plaintiff must show that: (1) the conduct of defendant was intentional or reckless; (2) the conduct of defendant was extreme and outrageous; (3) defendant's conduct caused emotional distress; and (4) the distress was severe. *Sabo v. UPMC Altoona*, 386 F. Supp. 3d 530, 556 (W.D. Pa. 2019). The defendant's conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998). Thus, "only the most egregious conduct" is sufficient, and liability under this cause of action is "reserved by the courts for only the most clearly desperate and ultra extreme conduct." *Id.*

Here, Romero has failed to adduce any evidence whatsoever that Detective Bray intentionally lied in his affidavit of probable cause or otherwise sought to initiate criminal proceedings against Romero for rape and other sex offenses despite knowing there was no probable cause. *See Anderson*, 677 Fed. App'x at 53. Indeed, as we have already found, even when viewed in the light most favorable to the plaintiff, the evidence of record clearly demonstrates that Bray did indeed have probable cause to bring these charges against Romero.

Moreover, as the Township Defendants have noted in their briefs, Romero has failed to adduce any objective evidence at all that he suffered severe emotional distress as a result of the criminal proceedings. *See Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987) ("Given the advanced state of medical science, it is unwise and unnecessary to permit recovery [for intentional infliction of emotional distress] to be predicated on an inference based on the defendant's 'outrageousness' without expert medical confirmation that the plaintiff actually suffered the claimed distress.").

Accordingly, the motion for summary judgment will be granted with respect to the plaintiff's state-law intentional infliction of emotional

distress tort claim against defendant Bray, set forth in Count V of the amended complaint.

## IV.   CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment will be granted.

An appropriate order follows.

Dated: September 13, 2021              ***<u>s/Joseph F. Saporito, Jr.</u>***
                                        JOSEPH F. SAPORITO, JR.
                                        United States Magistrate Judge